AO 106 (Rev. 04/10) Application for a Search Warrant



# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | )<br>)<br>) | Case No. 1:17SW518 |
| APPLE IPHONE, MODEL A1688, FCC ID: BCG-E2946A, IC: 579C-E2946A  LOCATED AT 44965 AVIATION DRIVE #112, DULLES, VIRGINIA 20166 | )<br>)<br>) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A (Property to be Searched)

located in the _____ Eastern _____ District of _____ Virginia _____, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B (Particular Things to be Seized)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952(a), 960(b)(1) (B), and 963 | Conspiracy to Import more than 5 Kilograms of Cocaine |

The application is based on these facts:

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/AUSA:
Jonathan Fahey/Thomas Traxler

_____
*Applicant's signature*

Michael Tarantino, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 21 Aug 17

City and state: Alexandria, Virginia

_____ /s/ _____
Ivan D. Davis
United States Magistrate Judge

## ATTACHMENT A

The property to be searched is (1) a ZTE Phone, Model Z981 with FCC ID: SRQ-Z981, and (2) an Apple iPhone, Model A1688, FCC ID: BCG-E2946A, IC: 579C-E2946A (collectively the "Devices").  The Devices are currently located at Homeland Security Investigations, ASAC Dulles, 44965 Aviation Drive #112, Dulles, Virginia 20166.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the Devices described in Attachment A that relate to violations of

21 U.S.C. §§ 952, 960, and 963, and that involve Rosemberg Majano (also known as Rosemberg

Majano Herrera) and/or Jose Orellana (also known as Jose Orellano Montalvo), including but not

limited to the following:

      a.   Any conversations, whether through text messages or other applications, related

         to the possession, distribution, or importation of controlled substances;

      b.   Any records of telephone calls or other communications with Rosemberg Majano,

         Jose Orellana, or other co-conspirators;

      c.   Any pictures or other digital media related to the possession, distribution, or

         importation of controlled substances;

      d.   Any lists of customers or suppliers of controlled substances, and related

         identifying information;

      e.   Types, amounts, and prices of controlled substances trafficked as well as dates,

         places, and amounts of specific transactions;

      f.   Any information related to sources of controlled substances (including names,

         addresses, phone numbers, or any other identifying information);

      g.   Any information recording Rosemberg Majano's and/or Jose Orellana's schedule

         or travel from January 1, 2017, to the present;

      h.   All bank records, checks, credit card bills, account information, and other

         financial records.

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA



IN THE MATTER OF THE SEARCH OF

Apple iPhone, Model A1688, FCC ID: BCG-
E2946A, IC: 579C-E2946A

CURRENTLY LOCATED AT
Homeland Security Investigations
ASAC Dulles
44965 Aviation Drive #112
Dulles, Virginia 20166

Case No. 1:17SW518

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Michael Tarantino, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of two electronic

devices, identified in Attachment A, which are currently in law enforcement possession at

Homeland Security Investigations, ASAC Dulles, 44965 Aviation Drive #112, Dulles, Virginia

20166 (collectively, the "Devices"). The first electronic device ("Device 1") is a ZTE Phone,

Model: Z981, FCC ID: SRQ-Z981. The second electronic device ("Device 2") is an Apple

iPhone, Model A1688, FCC ID: BCG-E2946A, IC: 579C-E2946A.

2.      I am a Special Agent of the United States Department of Homeland Security,

Homeland Security Investigations (HSI). I am assigned to the Washington Dulles International

Airport ("Dulles Airport"). My duties as a Special Agent with HSI include, but are not limited to,

the investigation of federal laws governing the importation and exportation of controlled

substances. I have received training in general law enforcement, including training in Titles 18 and 21 of the United States Code. I am a graduate of the Federal Law Enforcement Training Center at Glynco, Georgia.

3. During the course of my duties, I regularly investigate passengers who are suspected of smuggling contraband, namely controlled substances, into the United States in violation of the United States Code. As a result of my training and experience, I am familiar with the manner in which controlled substances are smuggled into the United States through major international airports.

4. This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the above-referenced search warrant. The facts and information contained in this affidavit are based on my personal knowledge as well as information obtained from other federal law enforcement officers.

5. This affidavit is submitted for the limited purpose of showing probable cause to believe that the Devices contain evidence, contraband, and fruits of the crimes listed in Attachment B, namely, a conspiracy to import more than 5 kilograms of cocaine, in violation of 21 U.S.C. §§ 952(a), 960(b)(1)(B), and 963. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data, as further explained in Attachment B.

## SUMMARY OF PROBABLE CAUSE

6. This search warrant relates to an investigation into a conspiracy to import cocaine into the United States through Dulles Airport. In exercising their border search authority, federal customs and border protection officers discovered cocaine hidden in packages of household

2

items in the luggage of an individual, Rosemberg Majano (also known as Rosemberg Majano Herrera), who was arriving at Dulles Airport on a flight from El Salvador. Majano stated that he was to be paid to deliver the packages to another individual who was supposed to meet him at the airport. Majano agreed to cooperate with law enforcement in identifying the individual. During Majano's cooperation, he received one or more calls on Device 1, which Majano possessed at the time he was stopped. The caller provided Majano with instructions regarding where to meet the individual who would pick up the packages. After Majano arrived at the place where the caller instructed him to go, Jose Orellana (also known as Jose Orellano Montalvo) attempted to pick up Majano in a white minivan. HSI agents recognized Orellana from previously observing him at the Dulles Airport at or around the same time as Majano. HSI agents, moreover, had observed Orellana's white minivan driving suspiciously in the area before attempting to pick up Majano. HSI agents stopped Orellana's vehicle after he attempted to pick up Majano. They observed Device 2 sitting on the front seat of the van. The phone was open and, in plain view, the call log could be seen and contained the number associated with Device 1.

### A. Current Charges

7.      Majano and Orellana are currently charged via criminal complaint in the Eastern District of Virginia (Case No. 1:17-mj-373) with conspiracy to import more than 5 kilograms of cocaine, in violation of Title 21, United States Code, Sections 952, 960, and 963. Both Majano and Orellana were arrested on August 10, 2017. On August 14, 2017, at a combined preliminary and detention hearing, the Honorable John F. Anderson, United States Magistrate Judge for the Eastern District of Virginia, (1) found that probable cause supported the charges in the criminal complaint, (2) ordered Majano's detention pending trial, and (3) released Orellana on a personal recognizance bond.

**B. Majano's Importation of Cocaine**

8.      On or about the afternoon of August 10, 2017, Majano, a national of El Salvador and permanent resident of the United States, arrived at Dulles Airport, in Loudoun County, Virginia, within the Eastern District of Virginia, on Avianca Airlines flight #582.  The flight had originated in San Salvador, El Salvador.

9.      Officer Rhazouani of the United States Customs and Border Protection ("CBP") encountered Majano in the international baggage claim area to conduct a routine roving baggage examination.  Majano had one checked piece of luggage.  Majano stated that his ultimate destination was Georgia and that he would be traveling there at 8:00 p.m.  He further stated that he was meeting his cousin at Dulles Airport.

10.     Officer Rhazouani conducted an examination of Majano's luggage.  In the luggage, Officer Rhazouani discovered bags of powdered milk and ground coffee.  Majano stated that the coffee was for him but that the milk was for family and friends.

11.     Officer Rhazouani opened one of the bags to examine its contents.  While Officer Rhazouani opened the bag, Majano became very nervous.  He was shaking and sweating, and suddenly stopped talking.

12.     Inside the bag, Officer Rhazouani found a clear plastic bag with a white powdery substance.  Officer Rhazouani contacted other officers for assistance.  Officer Stone, a K9 officer with the CBP, brought K9 Ferro, who positively alerted for narcotics odor on Majano's luggage.  Officer Kim of the CBP conducted a test of the white powdery substance, and it yielded positive results for the properties of cocaine.

4

13.     Majano was then placed in hand restraints and escorted to a holding cell. Before entering the holding cell, CBP officers obtained the contents from Majano's pockets, which included Device 1.

14.     Majano's luggage contained around 11 bags of household items, such as coffee and milk. CBP officers examined the remaining bags and discovered 10 additional plastic bags with white powdery substance concealed within the household items bags. The 11 bags of white powdery substance were placed on a scale for weighing, and the scale registered the weight at 8.377 kilograms.

### C. Interview of Majano

15.     At approximately 3:30 p.m., I arrived at the secondary inspection area and interviewed Majano. I advised Majano of his *Miranda* rights in the English language and provided him a written rights advisory/waiver form, which Majano stated that he understood and signed. Prior to advising Majano of his *Miranda* rights, I asked whether he spoke English and he confirmed that he did. He appeared to have no trouble understanding what I was saying to him in English.

16.     We then had a series of conversations, over the course of which Majano made a number of statements. Majano stated that he was to be paid $500.00 to deliver the 11 packages of household items to another individual (referred to herein as "CC-1"). He further stated that, following the delivery, he was going to take a bus to his home in Georgia. He also stated that he was to be met at the airport by CC-1. Majano claimed that he was told the name of CC-1, but did not know the individual.

### D. Majano's Assistance

17.     Majano agreed to attempt to make contact with CC-1 and was sent into the Dulles Airport international arrival waiting area. While being escorted to the international arrival waiting

5

area, Majano told HSI Special Agent Jay Culley that he had been instructed to proceed to a hotel in the event that he was not met at the airport.

18.     Before Majano entered the international arrival waiting area, law enforcement provided him with Device 1. Majano provided Special Agent Culley with the number for Device 1: 770-374-7042.

19.     Physical/personal contact was not made between Majano and CC-1 at Dulles Airport. However, Majano was called on Device 1 by an unknown source. The unknown caller stated that CC-1 was spooked. The unknown caller instructed Majano to proceed to Pollo Campero, a restaurant located in Herndon, Virginia.

20.     HSI agents transported Majano to Pollo Campero. Majano initially went into the restaurant and waited. During that time, HSI agents, including myself, observed a white minivan driving in the area and past the restaurant several times. Based on my training and experience, I believed the minivan to be driving suspiciously.

21.     Eventually, Majano went outside and the white minivan drove up to him at a bus stop. Majano subsequently informed HSI agents that he was instructed to get in the van. Majano did not get in, and the van drove away.

22.     HSI special agents conducted a vehicle stop of the white minivan and identified the driver as Jose Orellana (also known as Jose Orellano Montalvo). Orellana was the only occupant of the vehicle.

23.     Special Agent Popp and Special Agent DeRose had observed the minivan in the vicinity of Pollo Campero for approximately one hour prior to making contact with Majano.

24.     Special Agent Popp and Special Agent DeRose stated that they had recognized Orellana as having been at Dulles Airport for an extended period of time, including during the time

6

that Majano was waiting for CC-1. Orellana was observed walking back and forth from international arrivals to the ground transportation level.

25.     Special Agent Martinez, who was also present at the vehicle stop, observed Device 2 sitting on the front seat of the van. In plain view, Special Agent Martinez observed that Device 2 was on and opened. In plain view, Device 2's call log could be seen and contained the number 770-374-7042, which, as noted in paragraph 20, was the number associated with Device 1.

**E. Devices**

26.     The Devices are currently in the lawful possession of HSI. HSI agents seized the Devices when they arrested Majano and Orellana. Therefore, while HSI might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

27.     The Devices are currently in storage at Homeland Security Investigations, ASAC Dulles, 44965 Aviation Drive #112, Dulles, Virginia 20166. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of HSI.

## TECHNICAL TERMS

28.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.  *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of

7

transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic address books; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store other
digital data.  Some portable media players can use removable storage media.
Removable storage media include various types of flash memory cards or
miniature hard drives.  This removable storage media can also store any digital
data.  Depending on the model, a portable media player may have the ability to
store very large amounts of electronic data and may offer additional features such
as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its
current location.  It often contains records the locations where it has been.  Some
GPS navigation devices can give a user driving or walking directions to another
location.  These devices can contain records of the addresses or locations involved
in such navigation.  The Global Positioning System (generally abbreviated
"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite
contains an extremely accurate clock.  Each satellite repeatedly transmits by radio
a mathematical representation of the current time, combined with a special
sequence of numbers.  These signals are sent by radio, using specifications that
are publicly available.  A GPS antenna on Earth can receive those signals.  When
a GPS antenna receives signals from at least four satellites, a computer connected
to that antenna can mathematically calculate the antenna's latitude, longitude, and
sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used
for storing data (such as names, addresses, appointments or notes) and utilizing
computer programs.  Some PDAs also function as wireless communication

9

devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  *IP Address*: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

10

29.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.zteusa.com/ and http://www.apple.com/iphone/, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

31.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

> a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device.

11

b.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

33.   *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve

12

the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Michael Tarantino
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
On August 21, 2017:

_/s/_____

Ivan D. Davis
United States Magistrate Judge

13

## ATTACHMENT A

The property to be searched is (1) a ZTE Phone, Model Z981 with FCC ID: SRQ-Z981, and (2) an Apple iPhone, Model A1688, FCC ID: BCG-E2946A, IC: 579C-E2946A (collectively the "Devices"). The Devices are currently located at Homeland Security Investigations, ASAC Dulles, 44965 Aviation Drive #112, Dulles, Virginia 20166.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.    All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 952, 960, and 963, and that involve Rosemberg Majano (also known as Rosemberg Majano Herrera) and/or Jose Orellana (also known as Jose Orellano Montalvo), including but not limited to the following:

      a.   Any conversations, whether through text messages or other applications, related to the possession, distribution, or importation of controlled substances;

      b.   Any records of telephone calls or other communications with Rosemberg Majano, Jose Orellana, or other co-conspirators;

      c.   Any pictures or other digital media related to the possession, distribution, or importation of controlled substances;

      d.   Any lists of customers or suppliers of controlled substances, and related identifying information;

      e.   Types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

      f.   Any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

      g.   Any information recording Rosemberg Majano's and/or Jose Orellana's schedule or travel from January 1, 2017, to the present;

      h.   All bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2